IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| KENNETH KAUTSCH, RAYMOND<br>LEIGH YOUNG, ALAN HIGGINS, LOUIS<br>WATKINS, RANDY MALLICOAT,<br>JASON HOUSTON, and ROGER CAMDEN<br>on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PREMIER COMMUNICATIONS, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06-cv-04035-NKL |

**ORDER**

Plaintiffs are individuals who worked as technicians for Defendant Premier Communications ("Premier") and have brought suit against Defendants Premier, Premier Satellite of Oklahoma, LLC, Premier Investment Services, Inc. and Scott Aquino (collectively, "Defendants") for violating the Fair Labor Standard Act's ("FLSA") overtime requirement. Pending before the Court is Defendants' Motion for Partial Summary Judgment Based on the Motor Carrier Act Exemption [Doc. # 42]. For the reasons stated herein, Defendants' Motion is granted in part.

**I.    Facts**

Premier is a company whose technicians install DirecTV systems, perform upgrades and make service calls in customers' homes and in commercial buildings.

1

Samuel S. Conner, Premier's Director of Support Operations, leads the Premier team that is responsible for ordering materials from DirecTV. Using information gathered from each Premier warehouse manager and Premier's Senior Manager of Inventory Operation, both Premier and DirecTV calculate how much equipment should be shipped from DirecTV to Premier's warehouses. If Premier and DirecTV disagree on how much equipment should be sent, DirecTV's calculation prevails.

Once the shipment amount has been determined, DirecTV ships its equipment to Premier's Missouri locations from DirecTV's warehouse in Stonebridge, Georgia. DirecTV pays the cost of transporting the equipment to Premier. Upon receipt of the equipment, a warehouse manager scans the DirecTV equipment bar codes into Premier's system to track the equipment. DirecTV's ability to track the equipment is limited to knowing when a certain piece of equipment was shipped and where it was shipped. DirecTV also knows which customer actually received a piece of equipment when the unit is activated in the customer's home. DirecTV is able to determine the amount of inventory Premier has on any given day in any of Premier's warehouses. DirecTV also has access to information regarding how many satellites or receivers Premier has actually installed.

The contract between DirecTV and Premier states that title to the equipment Premier orders from DirecTV passes from DirecTV to Premier upon delivery to Premier's warehouse. However, Premier does not pay DirecTV for the equipment, and the contract grants DirecTV a first priority security interest in the equipment Premier possesses.

Furthermore, the contract states that if Premier maintains a warehouse in a state where its inventory is subject to a property tax and if the warehouse is a DirecTV-authorized ship-to location, then DirecTV will pay the property taxes owed on the DirecTV equipment stored in the warehouse.

Once Premier's technicians install equipment in a DirecTV customer's home, title to the equipment is transferred back to DirecTV and Premier is paid by DirecTV for the installation. Premier agrees to install the DirecTV equipment within thirty days of receiving it. At the end of the thirty days, DirecTV pays Premier based on the amount of equipment it has installed.[1] Premier never actually pays DirecTV for the equipment it receives, even if it fails to install the equipment within thirty days.

Premier does not modify the equipment it receives from DirecTV. Once Premier receives the equipment, Premier's technicians pick up whatever equipment they need from a Premier warehouse. Premier pays the cost of transporting the equipment from its warehouses to DirecTV's customers. Some technicians use their private vehicles to transport the equipment; others use vehicles owned by Premier. Regardless, no technician uses a vehicle that weighs 10,001 pounds or more.

## II. Discussion

Under the Fair Labor Standards Act, employers must pay overtime compensation at a rate of not less than one and one-half the employee's regular compensation rate. 29

---

[1] When a technician installs equipment for a customer, the technician has the customer execute a lease agreement, which is an agreement between the customer and DirecTV. Premier is not a party to the agreement.

3

U.S.C. § 207. The FLSA's maximum hour requirement, however, does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1).

According to 49 U.S.C. § 31502(b), the Secretary of Transportation

> may prescribe requirements for (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

This exception to the FLSA's applicability is commonly known as the Motor Carrier Act Exemption ("MCA Exemption"). The MCA Exemption applies to both "motor carriers" and "motor private carriers." It their motion, Defendants argue that summary judgment should be granted on Plaintiffs' FLSA claims because "Premier's technicians are 'motor private carriers,' as that term is used for purposes of the MCA Exemption." (Doc. 42 at 8, n.2).

### A. Motor Private Carriers

On August 10, 2005, the definition of "motor private carrier" was amended by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"). Pub. L. No. 109-59, 119 Stat. 1144 (2005). Prior to the enactment of SAFETEA-LU, a "motor private carrier" was defined as

> a person, other than a motor carrier, transporting property by motor vehicle when –
>   (A)  the transportation is as provided in section 13501 of this title;

> (B) the person is the owner, lessee, or bailee of the property being transported; and
> (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(13) (pre-August 10, 2005). Section 13501 governs the Secretary of Transportation's jurisdiction under the Motor Carrier Act. It provides as follows:

> The Secretary and the Board have jurisdiction . . . over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier –
> (1) between a place in –
>   (A) a State and a place in another State;
>   (B) a State and another place in the same State through another State;
>   (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
>   (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
>   (E) the United States and a place in a foreign country to the extent the transportation is in the United States . . .

49 U.S.C. § 13501(1).

Thus, prior to August 10, 2005, the MCA Exemption applied if (1) the person transported property by motor vehicle; (2) the person was engaged in interstate commerce; (3) the person was the owner, lessee, or bailee of the property being transported; (4) the property was being transported for sale, lease, rent, or bailment or to further a commercial enterprise; and (5) the person had some effect on the vehicle's "safety of operation."

SAFETEA-LU amended 49 U.S.C. § 13102 by adding the word "commercial" before "motor vehicle." As a result, after August 10, 2005, a "motor private carrier" is

5

defined as "a person . . . transporting property by commercial motor vehicle (as defined in section 31132)."  49 U.S.C. § 13102(15).[2]  Section 31132 defines a "commercial motor vehicle" as follows:

> "commercial motor vehicle" means a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle –
> (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;
> (B) is designed or used to transport more than 8 passengers (including the driver) for compensation;
> (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or
> (D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103.

49 U.S.C. § 31132(1).

The significance of the amendment to the "motor private carrier" definition has been described as follows:

> Before August 10, 2005, the FLSA's MCA exemption applied to most employees who drove any type and size of motor vehicle in interstate commerce.  After the passage of SAFETEA-LU, however, vehicles that were previously exempt under the old definition of "motor vehicle" are no longer exempt because they are not "commercial motor vehicles."
> *See* Felhaber, Larson, Felon, Vogt, P.A., *Big Changes in Exempt Status for Drivers and Mortgage Loan Officers*, 16 No. 4 Minn. Emp. L. Letter 2, at *2 (June 2006).

*Musarra v. Digital Dish, Inc.*, 454 F.Supp.2d 692, 701, n.19 (S.D. Ohio 2006).

---

[2] The pre-August 10, 2005 definition of motor private carrier was otherwise unchanged by SAFETEA-LU.

6

### B. Whether the MCA Exemption Applies to Plaintiffs' pre-August 10, 2005 Employment

In order to invoke the pre-August 10, 2005 MCA Exemption, Defendants must show (1) that Plaintiffs transported property by motor vehicle; (2) that Plaintiffs were engaged in interstate transportation; (3) that Plaintiffs were the owners, lessees, or bailees of the property being transported; and (4) that the property was being transported for sale, lease, rent or bailment or to further a commercial enterprise. 49 U.S.C. § 13102(13) (pre-August 10, 2005); 49 U.S.C. § 13501(1). In addition, Defendants must show that Plaintiffs were engaged in activities that affected the "safety of operation" of motor vehicles engaged in interstate commerce. 49 U.S.C. § 31502(b); *O'Neal v. Kilbourne Medical Laboratories, Inc.*, 2007 WL 956428, *10 (E.D. Ky. 2007).

#### 1. Transporting Property by Motor Vehicle

Defendants have established, and Plaintiffs do not dispute, that Plaintiffs transported property by motor vehicle.

#### 2. Engaged in Interstate Transportation

Plaintiffs argue that the MCA Exemption does not apply because "the equipment transported by plaintiffs is no longer moving in interstate commerce." (Doc. 43 at 9).

In the Eighth Circuit, "the determination of whether transportation between two points in a State is interstate (or foreign) or intrastate in nature depends on the 'essential character' of the shipment." *Roberts v. Levine*, 921 F.2d 804, 812 (8th Cir. 1990) (quotation omitted). The Eighth Circuit held that "the shipper's fixed and persisting intent at the time of shipment" is crucial to the determination of whether the intrastate

7

Case 2:06-cv-04035-NKL   Document 45   Filed 05/16/07   Page 7 of 14

transportation of property may nonetheless be considered interstate in character. *Id*. And, the shipper's "[i]ntent is ascertained from all the facts and circumstances surrounding the transportation." *Id*.

> The *Roberts* court framed the facts of its case as follows:
>
> [The shipper] controls the production, shipment, and subsequent sale of the urea. Although [the shipper] does not know the exact quantity of urea that each individual customer will receive when it ships urea to the [warehouse], it makes these shipments on the basis of past demand and estimated future need. [The shipper] does store the urea at [the warehouse], but the storage is only temporary.

*Id.* at 814. Based on these facts, the *Roberts* court found that the shipper "had the fixed and persisting intent to ship the urea beyond [the warehouse] and therefore . . . [the carrier's] intrastate transportation of urea was one leg of an interstate journey." *Id*.; *See also Guyton v. The Schwan Food Co.*, 2004 WL 533942, *5 (D. Minn. 2004) (finding that carriers' intrastate transportation of products was one leg of an interstate journey because the shipper controlled the production, shipment and sale of the product; shipments were made to in-state storage facilities based on forecasts and past demand; and the product was stored for a relatively limited period of time.).

Defendants rely heavily on *Musarra v. Digital Dish*, 454 F.Supp.2d 692 (S.D. Ohio 2006). In *Musarra*, the court found that the MCA Exemption applied to the claims of Digital Dish's satellite dish technicians who possessed an exclusive license to deliver and install DISH Network equipment in customers' homes. *Id.* at 694. The *Musarra* court considered the following factors when deciding whether the technician's intrastate transportation equated to a leg of an interstate journey: (1) whether the amount of product

8

shipped is based on the shipper's projections of customer demand; (2) whether the shipper processes or substantially modifies the product at the warehouse; (3) whether the product is subject to the shipper's control and direction as to subsequent transportation; (4) whether the shipper can track most of the shipments coming in and going out of the warehouse; (5) whether the shipper pays for transportation charges (even if the warehouse directly pays the carrier); (6) whether the shipper owns the warehouse; and (7) whether the product is subject to a storage in transit tariff provision. *Id.* at 708-09. As in *Roberts*, the *Musarra* court "recognized that no particular factor is, in and of itself, determinative and notes that the Court's analysis should be based upon the practical realities of the transportation at issue." *Id.* at 711 (citation omitted).

Plaintiffs cite cases from outside the Eighth Circuit where courts have held that "[t]here is no fixed and persisting intent to ship goods in interstate commerce where at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage." *Alice v. GCS, Inc.*, 2006 WL 2644958, *3 (N.D. Ill. 2006). In the Eighth Circuit, however, the court looks to all the facts and circumstances surrounding the transportation when determining whether the shipper's fixed and persistent intent is to ship goods in interstate commerce. *Roberts*, 921 F.2d at 812.

In this case, DirecTV's fixed and persisting intent at the time it ships equipment is that the equipment will be transported to a customer, not just to a warehouse. Though Premier takes title to the equipment when it is received at its warehouse, Premier never

9

pays DirecTV for the equipment. Indeed, DirecTV's earnings depend not on the sale of equipment to Premier, but on Premier successfully moving the equipment from the warehouse to the DirecTV customer where the technician executes a lease agreement between the customer and DirecTV. As a practical matter, the transfer of title from DirecTV to Premier for the limited period of time between Premier's receipt of the equipment and Premier executing the lease agreement between DirecTV and the customer does not change the Court's interstate commerce analysis. *See Bilyou v. Dutchess Beer Distributors, Inc.*, 2001 WL 286779, *3 (S.D.N.Y. 2001) (holding that distributor's acquisition of title to beer at in-state warehouse does not preclude a finding of interstate commerce where the beer was shipped to the warehouse from out of state).

Other facts evidence that Plaintiffs are completing one intrastate leg of an interstate journey when they transport DirecTV's equipment from the Premier warehouse to the customers' location. First, Premier is required to transport equipment from the warehouse to the customer within thirty days of receiving it. Second, DirecTV controls the amount of equipment shipped to Premier, and, third, Premier never modifies the equipment it receives from DirecTV. Though DirecTV does not own the warehouses and does not pay the technicians to transport the equipment, DirecTV is able to track the movement of its equipment to a limited extent.

In light of the facts and circumstances in this case, the Court concludes that no reasonable juror could find DirecTV's fixed and persistent intent was other than to ship its equipment in interstate commerce. Thus, Premier's technicians complete one leg of an

10

interstate journey when they transport DirecTV equipment from Premier's warehouses to the customer's location.

### 3. Owners, Lessees or Bailees of the Property Being Transported

Defendants contend that Plaintiffs were bailees of the DirecTV equipment they transported. A bailee is "[a] species of agent to whom something movable is committed in trust for another." Black's Law Dictionary (6th Ed. 1990). Plaintiffs did not own the DirecTV equipment that they were paid to transport and install at customers' locations. Therefore, Plaintiffs were bailees of the property being transported.

### 4. Property Transported to Further a Commercial Enterprise

Defendants have established, and Plaintiffs do not dispute, that Plaintiffs transported property in furtherance of a commercial enterprise.

### 5. Safety of Operation of Motor Vehicles Engaged in Interstate Commerce

It is undisputed that Plaintiffs routinely operated motor vehicles when they picked up DirecTV equipment from Premier's warehouse and when they traveled to customers' locations. Therefore, Plaintiffs engaged in activity that directly affects the safety of operation of motor vehicles engaged in interstate commerce. *See Guyton*, 2004 WL 533942, *6 (holding that "driving route delivery trucks . . . is an activity directly affecting safety as that phrase is used in the MCA").

Because no reasonable juror could find other than that Plaintiffs transported property by motor vehicle, that Plaintiffs were engaged in interstate transportation, that Plaintiffs were bailees of the property they transported, that the property was being

11

transported to further a commercial enterprise and that Plaintiffs' activities affected the "safety of operation" of the motor vehicles they drove, the MCA Exemption applies to Plaintiffs' pre-August 10, 2005 employment. Therefore, summary judgment is granted to Defendants as to Plaintiffs pre-August 10, 2005 claims.

## C. Whether the MCA Exemption Applies to Plaintiffs' Employment after August 10, 2005

Since SAFETEA-LU's August 10, 2005 enactment, a "motor private carrier" has been defined as a person transporting property by commercial motor vehicle. 49 U.S.C. § 13102(15). A commercial motor vehicle must weigh at least 10,001 pounds. 49 U.S.C. § 31132(1)(A). It is undisputed that Plaintiffs' motor vehicles weigh less than 10,001 pounds.

Defendants argue that the Court should give "deference to the Department of Labor's interpretation of the MCA Exemption," which found that "Premier did not violate FLSA's overtime requirements and [noted that the MCA Exemption] applied." (Doc. 42 at 18). In this case, however, the effect of SAFETEA-LU on the definition of a motor private carrier is unambiguous. This Court knows of no instance where a court has interpreted SAFETEA-LU in a manner inconsistent with its plain language. In fact, the *Musarra* court commented that "it is not clear that the [Department of Labor] even knew about the changes [to the definition of motor private carrier] when they took place." *Id.*, 454 F.Supp.2d at 701, n.19.

Applying the plain language of 49 U.S.C. § 13102(15) to the facts of this case, the Court finds that at all times after August 10, 2005, Plaintiffs were not motor private

12

carriers because Plaintiffs did not transport property by commercial motor vehicle. Therefore, the MCA Exemption does not apply to Plaintiffs' post-April 10, 2005 claims and summary judgment is denied as to those claims.

### D.     Waiver and Estoppel

Plaintiffs argue that Defendants waived their right to assert the MCA Exemption as an affirmative defense because Defendants asserted the defense in their answer to Plaintiffs' amended complaint, but did not assert the defense in their answer to Plaintiffs' original complaint. (Doc. 43 at 10). Plaintiffs' waiver argument is without merit because "[i]t is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect." *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000) (citing *Washer v. Bullitt County*, 110 U.S. 558, 562, 4 S.Ct. 249 (1884)). Therefore, Defendants properly asserted the MCA Exemption as an affirmative defense in their answer to Plaintiffs' amended complaint and Defendants failure to assert the defense in their original answer is of no consequence.

Plaintiffs also argue that Defendants are estopped from claiming the MCA Exemption because the "defendants' own documents show that defendants classified technicians as non-exempt." (Doc. 43 at 10). The documents include Premier's new hire forms and a June 6, 2005 letter sent from Premier's counsel to the Department of Labor. Under Missouri law, estoppel consists of three elements:

> (1) an admission, statement, or act by the person to be estopped that is inconsistent with the claim that is later asserted and sued upon; (2) an action taken by a second party on the faith of such admission, statement or act; and (3) an injury to the second party which would result if the

13

first party is permitted to contradict or repudiate his admission,
statement or act.

*Barry Simon Dev., Inc. v. Hale*, 210 S.W.3d 312, 317 (Mo. Ct. App. 2006).

In this case, Plaintiffs have not alleged that they took any action on the faith of Defendants' admission, statement or act. Accordingly, Plaintiffs have failed to satisfy a required element of estoppel under Missouri law. Therefore, Defendants are not estopped from claiming the MCA Exemption.

### III. Conclusion

Accordingly, it is hereby

ORDERED that Defendants' Motion for Partial Summary Judgment Based on the Motor Carrier Act Exemption [Doc. # 42] is GRANTED IN PART. Summary judgment is granted as to Plaintiffs' pre-August 10, 2005 claims and denied as to Plaintiffs' post-August 10, 2005 claims.

                                             s/ NANETTE K. LAUGHREY
                                             NANETTE K. LAUGHREY
                                             United States District Judge

Dated: May 16, 2007
Jefferson City, Missouri